IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| STEVEN W. YEE, | CASE NO. 3:19-CV-02301-SL |
| Petitioner, | JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| WARDEN KEITH FOLEY, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

## INTRODUCTION

On October 2, 2019, Steven W. Yee, a prisoner in state custody, filed through counsel a Petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #1). On September 10, 2020, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation (non-document entry of Sept. 10, 2020) and was reassigned to me on May 21, 2021, pursuant to General Order 2021-06 (non-document entry of May 21, 2021). Respondent Keith Foley,[1] in his official capacity as Warden of the Grafton Correctional Institution, filed a Return of Writ (ECF # 8) on January 4, 2021; Mr. Yee filed a

---

[1] The Petition identified LaShann Eppinger as the person having custody of Mr. Yee. The State asserts Keith Foley is the properly named Respondent as Warden of the institution housing Mr. Yee. (*See* ECF #7). The Ohio Department of Rehabilitation and Correction identifies Keith Foley as the Warden of Grafton Correctional Institution. http://drc.ohio.gov/gci (last accessed November 16, 2022). For the sake of convenience, in the balance of this Report and Recommendation, I refer to the Respondent as "the State."

Traverse to Return of Writ (ECF #12) on May 26, 2021; and the State filed a Sur-Reply to the Traverse (ECF #13) on June 10, 2021. The District Court has jurisdiction over the Petition under § 2254(a).

For the reasons discussed below, I recommend the District Court **DISMISS** Mr. Yee's Petition. I further recommend the District Court **DENY** Mr. Yee a certificate of appealability (COA).

### FEDERAL CASE

On March 3, 1989, Mr. Yee and two co-defendants (Mark S. Verdi and John Ray Bonds) were indicted for conspiracy and federal firearms offenses related to the fatal shooting in February 1987 of David Hartlaub. (*See* Indictment, Case No.: 3:89-cr-00720, ECF #1). On February 22, 1991, the jury found all three defendants guilty. (*Id.* at ECF #499). On appeal, the Sixth Circuit affirmed their convictions. *United States v. Bonds,* 12 F.3d 540 (6th Cir. 1993). The appellate court summarized the facts as follows:

> No bystanders saw the shooting. However, Douglas Waratuke, another music store employee, had followed Mr. Hartlaub to the bank and saw Mr. Hartlaub lying on the ground next to the van when Waratuke arrived at the bank. When Waratuke went to get out of his car, however, a man ran up and put a gun to Waratuke's head through the half-open window and ordered him to stay in the car. Based on Mr. Waratuke's description of the gunman as 25–27 years old, 5' 11", 165 pounds, with a "lanky build" and a "Hispanic appearance," the police made a sketch. Four other bystanders saw the same man and gave similar descriptions. One, Elizabeth Graf, also saw the getaway car, which she described to the police as a cream or tan color Buick, four door, dirty but in good condition.

> After the Hispanic-looking man ran away, apparently heading for a nearby hotel, Mr. Waratuke saw an arm reach out of the van and close the door; the occupant then drove off with the van. Police later found the van abandoned behind the hotel with its engine still running and lights on. The gun used in the shooting, a MAC-11 9-mm semi-automatic pistol fitted with a homemade silencer and a multi-round clip with a plastic garbage bag taped on to catch the spent cartridges, lay on the floor between the seats. The gun's serial number had been obliterated; however, the FBI was later able to "raise" the serial number. The gun turned out to have been owned

previously by Donald Myers, a former roommate of defendant Yee, who had owned two such guns and testified that they had been stolen from his car when it was parked outside their apartment.

Both the gun and the van's carpet were spattered with blood. Serology tests showed that the blood was not Mr. Hartlaub's, but rare enzymes identified in the spattered blood, which only appear in about 1% of caucasian males, matched those found in Mr. Bonds's blood. Most of the blood in the van had dripped between the front seats; shortly after the murder Mr. Bonds wore his right arm in a sling, and it was later established that he had a serious ricochet wound which evidently bled between the seats as he drove the van that night.

A few minutes after the shooting, two officers stopped a car for making an illegal turn about two miles from the bank. The car, which was headed away from the bank, had Defendant Mark Verdi at the wheel, Mr. Yee in the front passenger seat, and a third man in the back seat. As soon as the car was stopped, Yee got out and told the officers that he owned the car. Officer Jarrett asked Yee to get back in the car and approached the driver. When Verdi was unable to produce his driver's license, Jarrett asked him to step out of the vehicle and accompany him to the police cruiser while they checked the computer to see if Verdi was a licensed Ohio driver. Before placing Verdi in the back of the cruiser, Officer Hemmer patted down Verdi. Hemmer felt a hard round object with a hole in the middle in Verdi's pocket; Verdi said it was a roll of tape. Hemmer did not remove the object to confirm the truth of Verdi's statement because the object did in fact feel like a roll of electrical tape. During conversation, Verdi told the officers that they were "just passing through." A computer check revealed that Verdi was a licensed driver and that the car was registered to Steven Yee. Jarrett confirmed that the passenger that had claimed the car was his was in fact Steven Yee by asking to see Yee's license. The officers did not issue a citation to Verdi, nor did they speak to the man in the back seat. Although Jarrett remembers a squad car with siren and lights on drive past in the opposite direction (toward the bank), the officers did not know at the time of the stop that the murder had occurred.

Meanwhile, federal agents monitoring gang activity had received information that the Cleveland Hell's Angels were planning to retaliate against the Sandusky Outlaws for the Joliet shooting, at which Bonds had been present. The agents knew that Yee was a member of the gang and that Bonds and Verdi were prospective gang members, and when they learned of the murder, and of the subsequent stop of Yee and Verdi in Sandusky near the crime scene, the agents believed they were on the right track. They suspected that Bonds had shot Hartlaub in the van and driven off, that Yee was the "Hispanic looking" man who had confronted Waratuke and the others after the shooting, and that Verdi had picked the two up in Yee's car in back of the hotel after Bonds arrived in the van. Bonds, the agents believed, was the man later seen in the back of Yee's car during the police stop.

On March 3, federal, state and local officers met with a federal attorney to discuss the investigation. Present were, among others, FBI Special Agent George Steinbach and federal attorney Michael T. Rae ("AUSA Rae"). The agents discussed obtaining a search warrant for the Yee car; Mr. Rae agreed to help write up an affidavit for that purpose.

After obtaining grand jury subpoenas for the purpose, the agents took photos of Mr. Yee and of his car on March 7. When showed the photos of the car, witness Elizabeth Graf said it was not the same car, that the car she saw at the crime scene was "possibly lighter in color and possibly smaller." Also, by this time, the agents had found that the eyewitness descriptions of the gunman at the bank differed somewhat from Yee's actual appearance. They had found Yee to be of Chinese ancestry, age thirty-two, height 6' 3", 225 pounds, with black hair and brown eyes; Yee usually wore round wire-rim glasses.

On March 9, Eastlake, Ohio detective Tom Doyle searched Mark Verdi's home pursuant to a state warrant, looking for bank documents in connection with an unrelated crime. Doyle had known Verdi for over fifteen years and knew him to be connected with the Hell's Angels; he also had learned a few days earlier that Perkins Township police suspected Verdi was involved in the Hartlaub murder. Before he executed the warrant, Doyle, as was his practice when investigating possible gang-related crimes, had contacted a federal Bureau of Alcohol, Tobacco, and Firearms ("BATF") agent, Steve Wells, who was involved in tracking the Hell's Angels. Agent Wells and FBI Agent Stuart Shoaff told AUSA Rae that they wanted to tag along on Doyle's intended search; Rae opined (wrongly, as we shall see) that they would find nothing of value to the investigation. Nevertheless, Wells and Shoaff decided to accompany Doyle on the search of Verdi's home.

Besides finding evidence of the bank fraud, the state officers searching the house came across several items they believed to be evidence of the Hartlaub murder, including a map opened to Sandusky, black plastic bags and rolls of black electrical tape of the types used to make the plastic "shell catcher" bag and secure it to the murder weapon, and several firearms. The officers also found a briefcase or toolbox containing a grinder (which agents thought Verdi might have used to grind off the murder weapon's serial number), a mask, gloves, and a knife; Detective Doyle characterized these as constituting a "hit kit." Agent Shoaff called AUSA Rae to tell him of the find, and then secured the home while a federal search warrant was obtained.

In preparing the petition for the warrant, AUSA Rae decided to write up the affidavit to support the petition to search Mr. Yee's car as well as Mr. Verdi's home. While Rae apparently had the new information about Yee's actual appearance and Miss Graf's inability to conclusively identify his car, he did not include this in the affidavit; he later said the affidavits were prepared in a hurry and that he had forgotten about the new information. The agents submitted the affidavit to the magistrate along with

4

petitions to search Yee's car and Verdi's home and the magistrate issued the warrants. Before the warrant was executed, several witnesses were shown a photo array including Yee's picture. None of the witnesses was able either to identify or to exclude any of the individuals whose pictures were included in the array as having been the man they saw at the murder scene. AUSA Rae did not apprise the magistrate of the occurrence or result of the photo array.

Later that day, the agents conducted the second search of Verdi's home. They seized the items they had seen there before, as well as a MAC-11 of the same type as the murder weapon, with its serial number obliterated, a switchblade-type knife, a .45 caliber pistol, and a shirt matching the description of one worn at the crime scene by one of the gunmen.

In Yee's car, which the agents tracked down a few days later, the agents found, among other things, spent shell casings which experts later determined came from the murder weapon, and blood in the back seat which the FBI eventually matched with John Bonds's blood sample by DNA identification. A hair found in the back seat of the Yee car also matched Bonds's hair. Fibers found in the car also matched fibers from a green glove found three weeks after the murder on the side of the road (Route 2) connecting Cleveland and Sandusky. With the glove was found Mr. Hartlaub's van registration and title, an empty box of 9-mm cartridges of the type used in the murder and found in Yee's car (this box was later shown to have been bought at a gun shop near Mr. Yee's apartment), and a loaded revolver. A hair found on the glove matched Mr. Bonds's hair. Fibers found on the glove matched the carpeting in the van; the fibers of the glove itself matched fibers stuck to the tape attaching the cartridge-catcher bag to the murder weapon and also matched fibers found on the shirt seized from Mr. Verdi's home.

On March 16, the grand jury issued a subpoena ordering Mr. Bonds to submit to fingerprints and photographs; he complied. On April 20, another subpoena ordered him to appear for photographs of his bare arms, legs and torso, to see if he showed wounds consistent with those thought to have caused the blood stains in the van. On April 25, Bonds refused to comply, invoking his Fourth and Fifth Amendment rights. After a hearing before a district court judge, Bonds was ordered to comply by the morning of April 27 or be held in contempt. On April 27, Bonds was held to be in contempt and was taken into custody in the Cleveland Federal Courthouse. That evening, Bonds was taken to a jail in Toledo; the plan was to take him to a federal prison in Michigan the next day.

Agents prepared an affidavit seeking to obtain a search warrant for blood and hair samples from Mr. Bonds, which was brought before a federal magistrate judge in Toledo on April 28. The magistrate was satisfied with the reliability of the information and issued the warrant based on a finding of probable cause. The agents seized the samples from Bonds. These samples were the basis for evidence introduced at trial, including evidence that the DNA in Bonds's blood matched the DNA from

the blood found in the back seat of Yee's car. Bonds was subsequently indicted, but fled before he could be brought to trial; he was a fugitive for several months before being discovered in Kentucky.

All three defendants were eventually tried to a jury and convicted; Messrs. Verdi and Yee were each sentenced to a total of fifteen years and Mr. Bonds was sentenced to a total of twenty-five years.

*Bonds*, 12 F.3d at 547-49.

## PROCEDURAL HISTORY

### A.     State Conviction

In March 1989, the Erie County Grand Jury issued a six-count indictment against Mr. Yee, charging three counts of aggravated murder, murder, kidnapping and aggravated robbery. (State Court Record, ECF# 8-1 at PageID 82-83). The indictment included both capital and firearm specifications. (*Id.*).

On August 30, 1993, Mr. Yee entered guilty pleas to one count of aggravated murder and one count of aggravated robbery and two attendant firearm specifications. (*Id.* at PageID 264). The trial court entered a nolle prosequi on Counts 2 through 5 and dismissed the capital offense specification contained in Count 1. (*Id.*). Mr. Yee waived his right to a presentence investigation and agreed to be sentenced immediately. (*Id.*). The trial court sentenced Mr. Yee to life in prison for the aggravated murder (with eligibility for parole after serving twenty years), an indeterminate term of ten to twenty-five years for the aggravated robbery, and three years as to each firearm specification. (*Id.* at 265). The court ordered the sentences imposed for the aggravated murder and aggravated robbery to be served concurrently; the sentences for the firearms specifications to run consecutive to each other; the sentence imposed for aggravated murder and aggravated robbery to run consecutive to the sentence for the firearm specifications; and the aggregated sentence to run

consecutive to the fifteen-year federal sentence Mr. Yee was currently serving. (*Id.* at PageID 265-66). The sentence was journalized on September 17, 1993. (*Id.* at PageID 264).

## B.     Direct Appeal

On October 8, 1993, Mr. Yee, through counsel, filed a Notice of Appeal in Ohio's Sixth District Court of Appeals. (*Id.* at PageID 267). Mr. Yee raised three assignments of error:

> I.     The trial court erred in imposing consecutive sentences for firearm specifications where both felonies were part of the same act or transaction.
>
> II.    The trial court erred to the substantial prejudice of the defendant by imposing consecutive sentences for firearm specifications where both felonies were part of the same act or transaction. This violates the Double Jeopardy Clause of Article I, §10 of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.
>
> III.   The trial court was without jurisdiction to impose consecutive sentences for firearm specifications where the underlying felonies were part of the same act or transaction.

(*Id.* at PageID 277). The State filed a Brief of Appellee. (*Id.* at PageID 321). Mr. Yee filed a Reply Brief of Appellant. (ECF #8-2 at PageID 390).

On November 18, 1994, the appellate court concluded the trial court "erred in failing to conduct an evidentiary hearing on appellant's claim that his separate firearm specifications were predicated on felonies committed as part of the same act or transaction," vacated the portion of the trial court's order sentencing Mr. Yee to "two consecutive three year terms of actual incarceration on the firearm specifications," and remanded the case to the trial court to conduct such a hearing or "accept a stipulated statement of facts and from such facts determine whether or not the felonies and firearm specifications of which appellant was convicted were part of the same transaction or act." (*Id.* at PageID 438-39, 444-45). On December 28, 1995, the trial court entered

a nunc pro tunc judgment entry imposing three years of actual incarceration for the merged firearm specifications. (*Id.* at PageID 446-48).

### C.    Motion for Leave to Withdraw Guilty Plea or Vacate Conviction

On July 27, 2004, Mr. Yee, through counsel, filed a Motion for Leave to Withdraw Guilty Plea or, in the Alternative, to Vacate and Set Aside the Judgment of Conviction and Sentence in the trial court. (*Id.* at PageID 449). On April 11, 2005, the trial court denied Mr. Yee's motion. (*Id.* at PageID 1033). Mr. Yee did not appeal the trial court's decision.

### D.    Motion to Vacate Conviction

On April 8, 2011, Mr. Yee filed a Motion to Vacate Conviction or, in the Alternative, to Withdraw Guilty Plea. (*Id.* at PageID 1034). On May 10, 2011, the trial court denied Mr. Yee's motion without a hearing. (*Id.*). Mr. Yee did not appeal the trial court's decision.

### E.    Motion for De Novo Resentencing

On February 29, 2012, Mr. Yee, acting *pro se,* filed a Motion for De Novo Resentencing in the trial court. (*Id.*). The State filed a response to Mr. Yee's motion and Mr. Yee filed a reply brief. (*Id.*). On March 22, 2012, the trial court determined Mr. Yee's motion was one for post-conviction relief pursuant to Ohio Revised Code § 2953.21 and concluded the petition was untimely. (*Id.* at PageID 511). The trial court determined the petition was barred by the doctrine of res judicata and it did not have jurisdiction to entertain the motion. (*Id.* at PageID 512).

On April 18, 2012, Mr. Yee filed a Notice of Appeal to the Sixth District. (*Id.* at PageID 527). He asserted six Assignments of Error:

I.    The trial court committed plain error by failing to merge the defendant's charges of aggravated murder and aggravated robbery that both occurred by the same conduct at the same time, pursuant to the intervening Ohio

Supreme Court "retrospective" interpretation of R.C. § 2941.25, State v. Johnson, 128 Ohio St.3d 153, 942 N.E.2d 1051.

II.    The trial court committed plain error by resentencing the defendant with a nunc pro tunc journal entry to reflect what did not occur at the original sentencing hearing.

III.    The trial court committed plain error by resentencing the defendant without his presence before the court for sentence and/or oral or written waiver.

IV.    The trial court committed plain error by resentencing the defendant without affording him his allocution rights.

V.    The trial court committed plain error by resentencing the defendant in absentia.

VI.    The trial court committed plain error by resentencing defendant without complying with Crim. R. 32.

(*Id.* at PageID 537). On November 22, 2013, the Sixth District affirmed the trial court's judgment. (*Id.* at PageID 1044).

On December 2, 2013, Mr. Yee, acting *pro se*, filed a motion for reconsideration. (*Id.* at PageID 624). The State filed a response. (*Id.* at PageID 626). On February 6, 2014, the Sixth District denied Mr. Yee's application for reconsideration. (*Id.* at PageID 629).

On March 17, 2014, Mr. Yee filed a Notice of Appeal to the Ohio Supreme Court. (*Id.* at PageID 632). In his Memorandum in Support of Jurisdiction, Mr. Yee asserted the following propositions of law:

I.    Is the trial without Statutory Jurisdiction to sentence defendant concurrently when the sentence contains an allied offense of similar import rendering the sentence void?

II.    Is the Ohio Supreme Court decision of *State v. Johnson*, 128 Ohio St.3d 153, syllabus 3, a retroactive statutory interpretation of what R.C. 2941.25, has always meant, pursuant to *Taylor v. Ernst & Young, L.L.P.*, 130 Ohio St.3d 411; *Agee v. Russell*, 92 Ohio St.3d 540, 543.

9

III.   Are convictions for Aggravated Murder and Aggravated Robbery allied offenses of similar import when the offenses occurred buy the same conduct at the same time against the same person with the same animus under *State v. Johnson*, 128 Ohio St.3d 153; R.C. § 2941.25; and *State v. Penwell*, 2012-Ohio-5872.

IV.   Is a nunc pro tunc resentencing conducted by the trial court reflecting what was not originally done at sentencing void.

V.   Does a trial court commit plain error by resentencing a defendant without his presence in open court for resentencing render the proceeding void.

VI.   Does a trial court commit plain error by resentencing a defendant without affording him his allocution rights.

VII.   Does a trial court commit plain error by resentencing a defendant in a felony case in absentia, R.C. § 2945.12.

VIII.   Does a trial court commit plain error by resentencing a defendant without complying with Crim. R. 32.

(*Id.* at PageID 635-36) (cleaned up). The State filed a memorandum in opposition of jurisdiction.

(*Id.* at PageID 666). On June 11, 2014, pursuant to Rule 7.08(B)(4) of the Ohio Supreme Court

Rules of Practice, the Ohio Supreme Court declined to accept jurisdiction of Mr. Yee's appeal.

(ECF #8-2 at PageID 682). On June 16, 2014, Mr. Yee filed a Motion for Reconsideration, which

the court denied on September 3, 2014. (*Id.* at PageID 683, 687).

**F.    Application for Delayed Reconsideration**

Meanwhile, on April 24, 2012, Mr. Yee, *pro se*, filed an application for delayed

reconsideration of the Sixth District's decision on direct appeal, issued November 18, 1994. (*Id.* at

PageID 688). In his application, Mr. Yee argued the aggravated robbery and aggravated murder

convictions merged. (*See id.* at PageID 692). The State filed a response. (*Id.* at PageID 695). On July

11, 2012, the Sixth District concluded Mr. Yee's application was untimely because the time limit

for such a filing expired in November 1994 and Mr. Yee failed to set forth good cause for

reconsideration. (*Id.* at PageID 708). Moreover, the Sixth District concluded that even if

reconsideration was permitted, Mr. Yee's argument regarding merger of the aggravated murder and

aggravated robbery convictions (that could have been raised on direct appeal but was not) was

barred by the doctrine of res judicata. (*Id.* at PageID 708-09).

On August 15, 2012, Mr. Yee, *pro se*, filed a timely Notice of Appeal to the Ohio Supreme

Court. (*Id.* at PageID 710). In his Memorandum in Support of Jurisdiction, Mr. Yee asserted three

propositions of law:

I.    Is the offense of aggravated murder and aggravated robbery when committed by the same conduct at the same time allied offenses of similar import subject to merger under the new statutory interpretation of R.C. § 2941.25, *State v. Johnson,* 128 Ohio St.3d 153.

II.    Is a claim for an allied offense of similar import now a jurisdictional claim.

III.    Is the recent case of *State v. Johnson*, 128 Ohio St.3d 153 a retroactive statutory interpretation of what R.C. § 2941.25 has always meant.

(*Id.* at PageID 713) (cleaned up). The State filed a memorandum in opposition of jurisdiction. (*Id.*

at PageID 728). On November 7, 2012, the Ohio Supreme Court denied Mr. Yee leave to appeal

and dismissed the appeal as not involving any substantial constitutional question. (*Id.* at PageID

740). The Court also denied Mr. Yee's subsequent motion for reconsideration. (*Id.* at PageID 754).

**G.    Motion for Leave to Withdraw Void Guilty Plea**

On October 11, 2016, Mr. Yee filed with the trial court a Motion for Leave to Withdraw

His "Void" Guilty Plea based on actual innocence, prosecutorial misconduct, and newly

discovered evidence. (*Id.* at PageID 755). Mr. Yee attached several documents to his motion,

including an Affidavit of Steven W. Yee (*id.* at PageID 771); a letter from Norman Wong, special

counsel to the United States Department of Justice (DOJ), dated July 16, 2015 (*id.* at PageID 773),

11

with an attached letter from Mr. Wong to the United States Attorney in the Northern District of

Ohio, dated September 30, 2014, detailing the DOJ's review of microscopic hair comparison

analysis and the FBI's determination that statements made during Mr. Yee's federal trial regarding

such analysis exceeded the limits of science and were, therefore, invalid; FBI Microscopic Hair

Comparison Analysis Review Evaluation Forms (FBI Evaluation Forms) (*id.* at PageID 779-81); and

a letter from the FBI to the Innocence Project entitled Microscopic Hair Comparison Analysis

Result of Review (FBI Result of Review), dated August 1, 2013 (*id.* at PageID 782). The State filed

a response. (*Id.* at PageID 866). On March 29, 2017, the trial court denied Mr. Yee's motion. (*Id.*

at PageID 900).

On April 27, 2017, Mr. Yee filed a Notice of Appeal in the Sixth District. (*Id.* at PageID

901). Mr. Yee asserted two assignments of error:

I.   The trial court retains jurisdiction over deciding a post-sentencing motion to
     withdraw guilty plea Crim. R. 32.1, and committed plain error, Crim. R. 52(B)
     and/or abused its discretion by the denial of appellant's motion.

     Issue presented: Does a trial court retain jurisdiction to decide a post sentencing
     motion to withdraw guilty pleas? Yes.

VII. The trial court committed plain error, Crim. R. 52(B) and/or abused its
     discretion by the denial of Mr. Yee's motion to withdraw his guilty plea that was
     improperly motivated and/or coerced by the government that was utilizing bogus
     evidence to create a windfall conviction, rendering the guilty plea void and open
     to collateral attack at any time.

     Issue presented: Does a trial [court] commit plain error, Crim. R. 52(B) and/or
     abuse its discretion by denying a post sentence motion to withdraw guilty plea
     that was improperly motivated and/or coerced by the government that was
     utilizing bogus evidence to create a windfall conviction, rendering the guilty plea
     void and open to collateral attack at any time. Yes.

(*Id.* at PageID 904) (cleaned up). The State filed a response. (*Id.* at PageID 928). On February 9,

2018, the Sixth District affirmed the trial court's decision. (*Id.* at PageID 953). Mr. Yee filed a

motion for reconsideration. (*Id.* at PageID 961). On April 12, 2018, the Sixth District denied the motion. (*Id.* at PageID 972).

On May 21, 2018, Mr. Yee filed a Notice of Appeal with the Ohio Supreme Court. (*Id.* at PageID 976). In his Memorandum in Support of Jurisdiction, Mr. Yee asserted the same two errors. (*Id.* at PageID 979). The State filed a response. (*Id.* at PageID 1004). On August 1, 2018, the Ohio Supreme Court declined to accept jurisdiction of the appeal. (*Id.* at PageID 1021).

## FEDERAL HABEAS PETITION

On October 2, 2019, Mr. Yee, through counsel, filed in this Court a petition for a writ of habeas corpus asserting one ground for relief: his guilty plea was not made on a knowing and voluntary basis. (ECF #1 at PageID 16). In support, Mr. Yee states as follows:

> This case actually involves two separate and distinct trial level cases. First, a case was filed in federal court charging Petitioner and two others for crimes allegedly related to the death of David Hartlaub on February 27, 1988. The alleged facts giving rise to the federal case may be reviewed at *United States v. Bonds,* 12 F.3d 540 (6th Cir. 1993). As that case makes quite clear, a great deal of scientific evidence was introduced by the United States, almost all of which led to controversy. In fact, that was apparently a case of first impression in the Sixth Circuit with regard to the viability of DNA evidence. As a review of that case reveals, Microscopic Hair Comparison Analysis was also involved. Based upon this analysis, the United States, argued that Mr. Bonds was in Petitioner's automobile immediately after the incident in question. Thus, the Hair Analysis evidence was certainly not of de minimis value. That is not to say that there was no other evidence relied upon by the United States. However, that issue is best dealt with in the Petitioner's Traverse. In any event, Petitioner was eventually convicted and has served the entire sentence imposed upon him in federal court. Thus, the federal charges are not directly the subject of this Petition.
>
> Subsequently, Petitioner and his co-defendants entered guilty pleas in the Erie County Court of Common Pleas for charges arising out of the exact same facts. In the case of Petitioner, he entered pleas to Aggravated Murder and Aggravated Robbery, with attendant firearm specifications to both charges. The Petitioner entered these pleas based upon several considerations. First, he was advised that the State was going to present the exact same evidence in state court that the United States had in federal court, including the hair analysis evidence. Further, Petitioner was aware that the State intended to seek the death penalty. The hair analysis

13

evidence played a significant role in Petitioner's decision to enter pleas now in question.

Many years later, through the Innocence Project, the hair analysis, as well as the federal trial testimony relating thereto, was examined. Sometime in approximately August of 2013, the United States Department of Justice, through the Federal Bureau of Investigation, issued a document titled "Microscopic Hair Comparison Analysis Result of Review." That document is attached hereto, along with an Evaluation Form providing more detail, including specific transcript references with regard to the hair analysis information. Thus, in 2013, the Department of Justice unequivocally found at least three types of errors that the testifying examiner had committed during his testimony at Petitioner's trial, all of which involved testimony which exceeded the limits of science. But for this evidence set forth in the federal case, Petitioner would not have entered the guilty pleas now in question and, therefore, did not enter the pleas on a knowing and voluntary basis.

(*Id.* at PageID 16-17).

Mr. Yee attaches the FBI Evaluation Forms and FBI Result of Review to his Petition. (*Id.* at PageID 19-21). According to the Result of Review, the FBI conducted a Microscopic Hair Comparison Analysis Review regarding the analysis of testimony and lab reports provided in the federal case against Mr. Yee and his co-defendants. (ECF #8-2 at PageID 782). Specifically, the Result of Review identified three errors:

**Error Type 1:** The examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others. This type of testimony exceeds the limits of the science.

**Error Type 2:** The examiner assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association. This type of testimony exceeds the limits of the science.

**Error Type 3:** The examiner cites the number of cases or hair analyses worked in the lab and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual. This type of testimony exceeds the limits of the science.

(*Id.*).

STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr. Yee's Petition for writ of habeas corpus. *Lindh v. Murphy,* 521 U.S. 320, 336 (1997). The AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" and therefore acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 571 U.S. 12, 19 (2013). It "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citation and quotation omitted).

An application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Thus, a court may grant habeas relief if the state court arrives at a conclusion that is contrary to a decision of the Supreme Court on a question of law, or if the state court decides a case differently than did the Supreme Court on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Habeas courts review the last explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker,* 501 U.S. 797, 805 (1991). The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was

15

"objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001). For purposes of § 2254(d)(1), clearly established federal law "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams*, 529 U.S. at 412. A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam). A state-court decision is an unreasonable determination of the facts only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). A "state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them." *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006) (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)). Rather, "it is sufficient that the result and reasoning are consistent with Supreme Court precedent." *Id.* at 514. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Id.* at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 103.

DISCUSSION

As noted above, Mr. Yee sets forth a single ground for relief, asserting his guilty plea before the state trial court was not entered into on a knowing and voluntary basis:

> Petitioner did not have a full awareness of the circumstances at the time that he entered his guilty pleas in that he was not aware, and frankly could not have been aware, that the Justice Department would ultimately recognize that the expert testimony concerning the hair analysis exceeded the science in that regard and was improper. Quite clearly, Petitioner entered his guilty pleas based upon a false premise. Consequently, Petitioner's guilty pleas were not made on a knowing and voluntary basis, and he was deprived of his due process rights.

(ECF #12 at PageID 1091).

**A.      Mr. Yee's Petition is barred by the one-year statute of limitations of the AEDPA.**

Pursuant to 28 U.S.C. § 2244(d), a one-year statute of limitations applies to applications for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. *See also Duncan v. Walker*, 533 U.S. 167, 179 (2001) (noting that the one-year limitation period in § 2244(d)(1) meets the interest in the finality of state court judgments). The statute of limitations is not jurisdictional; rather, it is an affirmative defense that the responding party must raise in the first responsive pleading. *Day v. McDonough*, 547 U.S. 198, 205 (2006); *see also Scott v. Collins,* 286 F.3d 923, 927-28 (6th Cir. 2002). Though not jurisdictional, when the State asserts it and the petition is late, the district court should dismiss the case. *Akrawi v. Booker*, 572 F.3d 252, 260 (6th Cir. 2009); *see also McCray v. Vasbinder*, 499 F.3d 568, 577 (6th Cir. 2007) (reversing order granting habeas relief because the "gateway requirements" for excusing a time-barred petition—*i.e.*, equitable tolling and actual innocence—had not been satisfied).

The AEDPA's statute of limitations period runs from the latest of four dates:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

17

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

A petitioner whose conviction became final prior to the AEDPA's effective date, as Mr. Yee's did, is entitled to a "grace period" and has one year from the effective date, or until April 24, 1997, within which to file a petition for writ of habeas corpus. *See Payton v. Brigano*, 256 F.3d 405, 408 (6th Cir. 2001). Mr. Yee filed his habeas petition on October 2, 2019, well after the filing deadline, and thus his petition is untimely.

In the Petition, Mr. Yee claims he "is entitled to equitable tolling and is actually innocent. Although finality of judgment of conviction is much older than [one] year ago, evidence upon which petition is based was not discovered and could not have been discovered with due diligence until after September 2, 2014." (ECF #1 at PageID 13). To the extent Mr. Yee's statement is an argument that his Petition is timely because the new evidence is a factual predicate entitling him to a later start date of the one-year limitations period pursuant to § 2244(d)(1)(D), the argument is unavailing. Even if Mr. Yee could establish September 2, 2014, as the start of the limitations period, Mr. Yee's Petition is still untimely. The record reflects Mr. Yee waited more than two years after that date to file a petition for postconviction relief or other collateral review in the state court. (ECF #8-2 at PageID 755). Moreover, after the Ohio Supreme Court declined to accept

jurisdiction of the appeal on August 1, 2018, Mr. Yee waited more than one year to file his Petition in this Court. (*Id.* at PageID 1021).

1. **Statutory tolling is unavailing to Mr. Yee.**

The limitations period is tolled while a state prisoner seeks postconviction relief in state court. Under § 2244(d)(2), the time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending does not count toward any period of limitation. The Supreme Court has determined an application is "'properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee." *Artuz v. Bennett,* 531 U.S. 4, 8 (2000).

Because Mr. Yee's state convictions became final prior to the AEDPA's effective date of April 24, 1996, he had until April 24, 1997, to file a timely federal habeas petition. In that time, Mr. Yee did not file an application for state post-conviction or other collateral review that would toll the one-year limitations period. He filed his first post-conviction motion with the trial court on July 27, 2004, more than seven years after the limitations period expired. (*See* ECF #8-2 at PageID 449). Though a properly filed application for state post-conviction or other state collateral review tolls the statute of limitations while the application is pending, it cannot revive the limitations period (*i.e.,* restart the clock) after it has expired. *Patterson v. Lafler,* 455 Fed. App'x 606, 608 (6th Cir. 2012). Even assuming Mr. Yee's 2004 Motion for Leave to Withdraw Guilty Plea or, in the Alternative, to Vacate and Set Aside the Judgment of Conviction and Sentence is "a properly filed

application for state post-conviction or other collateral review," it does not revive the already-expired limitations period.

Moreover, even assuming the new evidence served as a factual predicate entitling Mr. Yee to a start date of September 2, 2014, in accordance with § 2244(d)(1)(D), the limitations period would not have been tolled because he did not file an application for post-conviction relief or other state collateral review before September 2, 2015.

I conclude that statutory tolling does not apply to Mr. Yee's Petition filed in this Court in 2019.

### 2.    Equitable tolling is equally unavailing to Mr. Yee.

In his Traverse, Mr. Yee claims even if his Petition is untimely, he is actually innocent and entitled to equitable tolling, thereby allowing this Court to review his Petition on the merits. (ECF #12 at PageID 1083-89). The State asserts Mr. Yee has not provided sufficient evidence to warrant equitable tolling of the limitations period. (ECF #8 at PageID 58-59).

AEDPA's statute of limitations is not "an inflexible rule requiring dismissal whenever its clock has run" and is "subject to equitable tolling." *Holland v. Florida*, 560 U.S. 631, 645-46, 649 (2010) (internal quotations omitted). In *Holland,* the Supreme Court held that a habeas petitioner "is entitled to equitable tolling only if he shows (1) he has been pursuing his rights diligently; and (2) some extraordinary circumstance stood in his way and prevented timely filing." *Id.* at 391. In *Schlup v. Delo*, 513 U.S. 298 (1995), the Court further held that a petitioner who asserts a credible claim of actual innocence can "avoid a procedural bar to the consideration of the merits of his constitutional claims." *Id.* at 327. Based on *Schlup*, the Sixth Circuit has held a petitioner who presents a credible claim of actual innocence is entitled to equitable tolling of the AEDPA's statute

20

of limitations. *Souter v. Jones,* 395 F.3d 577, 601 (6th Cir. 2005) ("where an otherwise time-barred habeas petitioner can demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying constitutional claims"). The exception is rare and only applied in extraordinary cases. *See Schlup,* 513 U.S. at 321; *see also Souter,* 395 F.3d at 590.

The State argues Mr. Yee is not entitled to equitable tolling because he has not shown reasonable diligence in pursuing his rights, nor has he provided evidence demonstrating that extraordinary circumstances stood in his way to prevent filing. (ECF #8 at PageID 59). I disagree. In *McQuiggin v. Perkins,* 569 U.S. 383, 387 (2013), the Court made clear that a petitioner asserting a convincing claim of actual innocence is not required to "prove diligence to cross a federal court's threshold," but timing remains "a factor relevant in evaluating the reliability of a petitioner's proof of innocence." *Id.* at 399.

To demonstrate actual innocence that would allow a court to consider a time-barred habeas claim, a petitioner must present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" *Schlup,* 531 U.S. at 316. The threshold inquiry is whether "new facts raise sufficient doubt about [the petitioner's] guilt to undermine the confidence in the result of the trial." *Id.* at 317. The petitioner's evidence must include "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. Although the examples of new evidence cited in *Schlup* "were not meant to be an exhaustive list of everything upon which an actual innocence

21

claim may be based," *Souter*, 395 F.3d at 595 n.8, "the *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (citation omitted). A federal court considering such an actual innocence claim must consider the fully developed record and the new evidence. *Schlup,* 531 U.S. at 329. "Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *House,* 547 U.S. at 538 (quoting *Schlup,* 531 U.S. at 329. After reviewing all the evidence, if "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," the petitioner is entitled to a review of the merits of his underlying constitutional claim. *Schlup*, 531 U.S. at 327.

In *House*, the Supreme Court concluded the petitioner satisfied the standard by putting forth evidence that called into question the central forensic proof, blood and semen, connecting the petitioner to the crime, and substantial evidence pointing to a different suspect. 547 U.S. at 540-54. The Court noted this was a close case, acknowledging that some aspects of the state's evidence still supported an inference of guilt, but the existence of evidence undermining the forensic proof, and the petitioner's production of evidence from multiple sources suggesting that the victim's husband regularly abused the victim, were sufficient for the Court to conclude that, had the jury heard all the conflicting testimony, it was more likely than not that no reasonable juror viewing the record as a whole would have found the petitioner guilty beyond a reasonable doubt. *Id.* at 553-54. In *Souter*, the Sixth Circuit held the petitioner met the actual innocence standard where the petitioner presented compelling proof that a bottle – the only direct evidence linking him to the death – could not have caused the victim's injuries. 395 F.3d at 596-97.

In this case, Mr. Yee has not presented evidence sufficient to meet the demanding actual innocence standard necessary to trigger equitable tolling of the AEDPA limitations period. As in *House* and *Souter,* the evidence attached to Mr. Yee's petition seriously undermines some of the forensic evidence presented during the federal case. The FBI Result of Review acknowledges that certain of the FBI examiner's testimony at trial regarding the microscopic hair comparison analysis exceeded the limits of the science. (*See* ECF #8-2 at PageID 782). However, the circumstances of Mr. Yee's case are otherwise distinguishable from those rare cases allowing for equitable tolling based on a petitioner's claim of actual innocence.

The evidence Mr. Yee relies on relates only to the microscopic hair comparison of hair *traced to his co-defendant, Mr. Bonds,* and does not call into question any other forensic or other evidence presented at the federal trial. The hair samples traced to Mr. Bonds were collected from the back seat of Mr. Yee's car and on a glove recovered after the murder. *Bonds,* 12 F.3d at 549. The hair samples placed Mr. Bonds in Mr. Yee's vehicle and connected Mr. Bonds to the glove, which also contained carpet fibers matching the carpet fibers in the victim's van.

Even without the microscopic hair comparison, the remaining evidence still places Mr. Bonds in Mr. Yee's vehicle and connects the glove found on State Route 2 with both of them. Mr. Bonds' blood puts him in both the murder victim's van and the backseat of Mr. Yee's car. Fibers from the glove matched fibers collected from Mr. Yee's vehicle and carpeting fibers from the victim's van. Moreover, the microscopic hair evidence does not detract from evidence placing Mr. Yee in the vicinity of the murder, including the traffic stop and shell casings in Mr. Yee's vehicle that match shell casings in the victim's van.

Therefore, I conclude the undermined microscopic hair comparison evidence, by itself, does not raise sufficient doubt about Mr. Yee's guilt to undermine the confidence in the result of the trial. Mr. Yee has not shown that it is more likely than not that, without consideration of the undermined evidence, no reasonable juror would have found petitioner guilty beyond a reasonable doubt. As a result, Mr. Yee is not entitled to equitable tolling based on his claim of actual innocence. For these reasons, the court should dismiss his petition as time barred.

**B.  Even if reviewed on its merits, Mr. Yee's Petition provides no basis for federal habeas relief.**

Mr. Yee's Petition does not present a claim warranting federal habeas corpus relief. For purposes of habeas corpus review of state court decisions, a state court's findings of fact are presumed correct and can be contravened only if the habeas petitioner shows, by clear and convincing evidence, that the state court's factual findings are erroneous. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530.

The Sixth District set forth the following statement of facts in the last explained state-court judgment on the federal claim at issue:

{¶ 2} Appellant has been before this court on several occasions. Most recently, we considered appellant's arguments concerning a petition for postconviction relief that was filed by him and denied by the trial court. *State v. Yee*, 6th Dist. Erie No. E-12-017, 2013-Ohio-5184. In that case, we summarized the background facts of this case as follows:

In March 1989, the Erie County Grand Jury issued a six count indictment against appellant, Steven W. Yee, charging three counts of aggravated murder, murder, kidnapping and aggravated robbery. The indictment included both capital and firearm specifications.

24

Yee entered into a plea agreement wherein the state promised to nolle four counts of the indictment and the capital specifications. In exchange, Yee agreed to enter a plea of guilty to one count of aggravated murder with a firearm specification and one count of aggravated robbery with a firearm specification. On August 30, 1993, Yee appeared in court, withdrew his previous pleas of not guilty and entered pleas of guilty pursuant to the agreement. When entering his plea, Yee reserved the right to appeal the trial court's authority to sentence him to two consecutive terms of incarceration on the firearms specifications.

A sentencing hearing was held in September 1993. As to the charge of aggravated murder, Yee was sentenced to life in prison with eligibility of parole after 20 years. As to the charge of aggravated robbery, Yee was sentenced to 10-25 years in prison. Yee was sentenced to three years each for the two firearm specifications. The trial court ordered that the sentences for the aggravated murder and aggravated robbery be served concurrently. The sentences for the firearm specifications were ordered to be served consecutive to each other and consecutive to the concurrent sentences for aggravated murder and aggravated robbery.

Yee appealed. Upon review, we vacated the portion of the sentence which imposed two consecutive three-year terms of incarceration for the firearms specifications. *See State v. Yee*, 6th Dist. Erie No. E-93-72, 1994 Ohio App. LEXIS 5142 (Nov. 18, 1994). * * *

We remanded the matter to the trial court.

On December 28, 1995, with consent of counsel, the trial judge issued a judgment entry nunc pro tunc merging the firearm specifications and imposing three years of actual incarceration for the specifications. The stated purpose of the entry was to "reflect the correct language as to the sentence imposed on the firearm specifications." The judgment entry was filed with the clerk of courts on January 4, 1996.

On July 27, 2004, Yee filed a motion for leave to withdraw his guilty pleas or, in the alternative, to vacate and set aside the judgment of conviction. The trial court denied Yee's motion. On April 8, 2011, Yee filed a motion to vacate his conviction or withdraw his guilty plea. Again, the trial court denied Yee's motion.

On February 29, 2012, Yee filed a motion for de novo resentencing pursuant to the Ohio Supreme Court's decision in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. The trial court, construing the motion as a petition for postconviction relief under R.C. 2953.21, denied the motion as untimely. The trial court also found that Yee's claims were

25

barred by the doctrine of res judicata. *Yee*, 6th Dist. Erie No. E-12-017, 2013-Ohio-5184, at ¶ 2-8.

{¶ 3} Appellant subsequently appealed the trial court's denial of his petition for postconviction relief. We rejected appellant's arguments, and found that the trial court did not abuse its discretion in denying the postconviction petition. *Id.* at ¶ 15.

{¶ 4} Thereafter, on October 11, 2016, appellant filed a "motion for leave to withdraw his 'void' guilty plea based on actual innocence, prosecutorial misconduct and newly discovered evidence" pursuant to Crim.R. 32.1. In his motion, appellant asserted that his conviction was void because he was lured into pleading guilty despite his innocence based upon the state's pledge to seek the death penalty "with a 100% chance of acquiring it" based on "bogus" DNA evidence. In support of his argument, appellant stated that he had recently received documents the FBI sent to the Innocence Project on August l, 2013, allegedly revealing that the federal government utilized misleading evidence to secure his convictions in federal court. Appellant insisted that, had he been aware of the use of such evidence, he would not have entered a guilty plea. Appellant further indicated that the state threatened to use the same bogus" evidence as the federal authorities used to secure the convictions.

{¶ 5} In response to appellant's motion, the state noted that the evidence referred to by the FBI in its letter to the Innocence Project pertained to hair analysis that was performed by the government's experts. The conclusions drawn from the hair analysis were later found to have exceeded the limits of science. However, the state argued that this evidence was inconsequential in light of the overwhelming incriminatory evidence that remained to establish appellant's guilt.

{¶ 6} The state pointed out that the FBI's letter included a disclaimer that the Bureau took "no position regarding the materiality of the error in this case." Moreover, the state cited the additional incriminating evidence to support its opposition to appellant's motion. This evidence placed appellant in the vicinity of the murder on the day in question, and included, inter alia, shell casings that were discovered in appellant's vehicle matching those found in the victim's vehicle as well as a coconspirator's blood found in both the victim's vehicle and appellant's vehicle.

{¶ 7} The state also emphasized the fact that appellant's guilty plea, which followed the state's disclosure of all incriminating evidence including the hair analysis, constituted an absolute admission of guilt belying his claim of actual innocence.

{¶ 8} Upon consideration of the parties' arguments, the trial court issued its decision summarily denying appellant's motion to withdraw his guilty plea on March 30, 2017. Appellant's timely notice of appeal followed.

(ECF #8-2 at PageID 954-57); *State v. Yee*, No. E-17-024, 2018 WL 798263, at *1-2 (Ohio Ct. App.

Feb. 9, 2018), *appeal not allowed*, 103 N.E.3d 831 (Ohio 2018) (table).

The Sixth District affirmed the trial court's denial of Mr. Yee's request to withdraw his guilty plea.

{¶ 11} Under Crim.R. 32.1, "[a] motion to withdraw a plea of guilty or no contest may be made only before sentence is imposed; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his or her plea." A motion to withdraw a guilty plea made subsequent to sentencing will be granted only in "extraordinary cases" upon the demonstration of manifest injustice.

{¶ 12} A motion made pursuant to Crim. R. 32.1 is left to the sound discretion of the trial court. *Id.* at paragraph two of the syllabus. Thus, we review the trial court's decision denying appellant's motion under an abuse of discretion standard. Abuse of discretion suggests that the trial court's decision was unreasonable, arbitrary or unconscionable.

{¶ 13} In his first assignment of error, appellant argues that the trial court retained jurisdiction to consider his motion to withdraw his guilty plea. In his second assignment of error, appellant contends that the trial court abused its discretion in denying his motion to withdraw his guilty plea.

{¶ 14} In making his arguments, appellant relies upon the FBI's letter to the Innocence Project as evidence that he was actually innocent of the crimes for which he was convicted. However, the statements made in the letter, as represented to this court by appellant, only call into question the veracity of a small fraction of the state's evidence—namely the scientific reliability of the hair analysis that was performed in this case. As noted by the state, the incriminating evidence implicating appellant in this case was not limited to the hair evidence. Moreover, it is axiomatic that a guilty plea operates as a complete admission of guilt. Appellant does not challenge the trial court's plea colloquy or assert that his plea was not knowing, intelligent, and voluntary.

{¶ 15} In sum, we find that the newly discovered unreliability of the hair analysis evidence in this case, standing alone, does not justify a finding a manifest injustice necessary to warrant the granting of appellant's motion to withdraw his guilty plea under Crim.R. 32.1. Therefore, we find that the trial court did not abuse its discretion in denying the motion. Accordingly, appellant's assignments of error are not well-taken.

*Yee*, 2018 WL 798263, at *3 (citations omitted).

Whether the trial court erred in denying a petitioner's motion to withdraw a guilty plea is primarily a question of state law and is therefore not a cognizable ground for habeas relief. *Alt v.*

*Eppinger,* No. 1:14 CV 00100, 2015 WL 3489867, at *7 (N.D. Ohio Jun. 2, 2015). It is well-settled

that "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire,* 502 U.S.

62, 67 (1991) (internal quotations omitted). A federal habeas court may not reexamine state court

determinations based solely in state law. *Bradshaw v. Richey,* 546 U.S. 74, 76, (2005). Rather, a state

court's interpretation of state law "binds a federal court sitting in habeas corpus." *Id.* Thus, federal

courts may not issue a writ of habeas corpus on the basis of a perceived error of state law but are

limited only to deciding whether a petitioner's conviction violated the Constitution, laws, or

treaties of the United States. *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also* 28 U.S.C. § 2254(a).

A claimed error of state law may nevertheless serve as a basis for federal habeas relief if the ruling

was so fundamentally unfair as to violate due process. *Seymour v. Walker,* 224 F.3d 542, 552 (6th

Cir. 2000); *see also Montana v. Egelhoff,* 518 U.S. 37, 43 (1996).

  More than an admission of past conduct, a guilty plea is a criminal defendant's waiver of

certain constitutional rights, including the right to a trial by before a judge or a jury, and therefore

is a "grave and solemn act to be accepted only with care and discernment." *Brady v. United States,*

397 U.S. 742, 748 (1970). The Supreme Court demands the waiver of constitutional rights to be

voluntary and "knowing, intelligent acts done with sufficient awareness of the relevant

circumstances and likely consequences." *Id.* Whether a state trial court's denial of a motion to

withdraw a guilty plea implicates constitutional concerns turns on whether the plea was entered

into knowingly and voluntarily or, in other words, "'represents a voluntary and intelligent choice

among the alternative courses of action open to [him].'" *Salter v. Tambi,* No. 1:04cv1682, 2006 WL

2360924, at *7 (N.D. Ohio Aug. 15, 2006) (quoting *North Carolina v. Alford,* 400 U.S. 25, 31

(1970)); *Brady v. United States,* 397 U.S. 742, 748 (1970). The voluntariness of a guilty plea is determined by considering all relevant circumstances surrounding it. *Brady*, 397 U.S. at 749.

Consideration of the relevant circumstances leads to one conclusion—Mr. Yee pleaded guilty voluntarily and knowingly. At Mr. Yee's combined plea and sentencing hearing, the state court confirmed Mr. Yee understood the charges to which he agreed to plead guilty and the maximum sentences that could be imposed; the constitutional rights he waived by pleading guilty, including the right to a jury trial, to compel witnesses to testify on his behalf and cross-examine witnesses, and to testify on his own behalf or choose to remain silent without comment from the state; and that he entered the plea voluntarily, not under force or duress. (ECF #8-2 at PageID 1055-66). Mr. Yee pleaded guilty to the state charges based on a number of considerations, including the state's intention to introduce the same evidence presented in the federal trial upon which he and his codefendants were found guilty (including the hair comparison evidence), and the state's promise to dismiss the capital specification in exchange for a guilty plea. (ECF #1 at PageID 16-17; *see also* ECF #8-2 at PageID 1070 (Mr. Yee stating: "As far as the case, this thing had to happen legal-wise because the case is identical to what happened in Toledo. The witnesses are the same. The prosecution is the same. The evidence is the same. . . . I felt it was a waste of time to go to trial because it only took eleven hours to lose the first time.").

Now, Mr. Yee theorizes the new information undermining the reliability of the hair comparison evidence renders his plea involuntary. Mr. Yee's argument fails because later developments affecting a habeas petitioner are not pertinent to whether the petitioner's guilty plea was made voluntarily. In *Brady*, the Supreme Court instructs:

> A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own

counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady*, 397 U.S. at 756 (citations omitted). The transcript of the combined plea and sentencing hearing shows Mr. Yee was fully aware of the parameters of the guilty plea and the rights he was giving up in exchange for the plea, and confirms Mr. Yee acknowledged his plea was made voluntarily. Moreover, addressing the calculus involved in entering a plea agreement, the Supreme Court states:

> Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted. Considerations like these frequently present imponderable questions for which there are no certain answers; judgments may be made that in the light of later events seem improvident, although they were perfectly sensible at the time. The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision. A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action. More particularly, absent misrepresentation or other impermissible conduct by state agents, a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise.

*Id.* (citation omitted).

The fact that Mr. Yee did not anticipate the value of the hair comparison evidence would be subsequently undermined in 2014 does not impugn the intelligence and voluntariness with which he entered his guilty pleas in 1993. Though the state appellate court analyzed Mr. Yee's claim as a challenge to a state criminal rule and not the federal constitutional issue, the court's result and reasoning are consistent with Supreme Court precedent. Accordingly, Mr. Yee has not met AEDPA's exacting standards by showing the state appellate court's adjudication "(1) resulted

30

in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Therefore, in the event the District Court concludes Mr. Yee's petition is subject to equitable tolling to overcome the one-year statute of limitations, I recommend the court conclude Mr. Yee's claim fails on the merits.

CERTIFICATE OF APPEALABILITY

A certificate of appealability (COA) may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." *Rules Governing § 2254 Cases*, Rule 11(a). When a district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claims, a COA should issue, and an appeal of the district court's order may be taken, if petitioner shows that jurists of reason would find it debatable whether petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude that the district court erred in dismissing the petition or that the petition should be allowed to proceed further. In such a circumstance, no appeal would be warranted. *Id.*

I recommend the District Court decline to issue a COA to Mr. Yee because reasonable jurists would not find it debatable whether the court was correct in determining Mr. Yee filed his

habeas petition outside of the one-year limitations period and was not entitled to equitable tolling.

*See Grayson v. Grayson*, No. 01-71813, 185 F. Supp. 2d 747, 753 (E.D. Mich. Jan. 3, 2002).

CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, I recommend Mr. Yee's Petition be

**DISMISSED**. I further recommend the District Court **DENY** Mr. Yee a certificate of appealability.

Dated: November 16, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

Objections, Review, and Appeal

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).